UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JOSHUA FLORES, ALEXANDR KLIMUSHKIN, JASON HENDERSON, MARK KROHN, and PATRICK GRAVENESE, on behalf of themselves and all others similarly situated, | Case No.: <br><br> Hon. <br><br> **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| FCA US LLC, a Delaware corporation, | |
| Defendant. | |

The allegations in this complaint are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to all other matters based on an investigation by counsel.

## INTRODUCTION

1.       This is a putative class action against FCA US, LLC ("FCA" or "Fiat Chrysler Automobiles") on behalf of individuals who purchased or leased any of the following vehicles sold with an electronic sway bar disconnect (hereinafter, the "Class Vehicles"):

- 2007-2017 Jeep Wrangler Rubicon ("JK")

- 2007-2017 Jeep Wrangler Unlimited Rubicon ("JKU")

- 2018-2020 Jeep Wrangler Rubicon ("JL")

- 2018-2020 Jeep Wrangler Unlimited Rubicon ("JLU")

- 2020 Jeep Gladiator Rubicon

- 2005-2010 Dodge Ram 2500 Power Wagon

- 2011-2020 Ram 2500 Power Wagon

2.       As described in greater detail below, a sway bar (also called an "anti-roll bar" or "stabilizer bar") is part of a car's suspension system.  It provides stability and helps prevent the car from leaning to one side when turning.  Driving on streets or highways with a disconnected or malfunctioning sway bar is dangerous.

1

3.      For cars that are suitable for off-roading, like the Class Vehicles here, it is sometimes advantageous to temporarily disconnect the sway bar when driving in rough terrain.  The Class Vehicles' suspension systems include an electronic sway bar disconnect, which is intended to allow the driver to quickly disconnect and reconnect the sway bar with the push of a button on the dashboard.

4.      The problem, however, is that the electronic sway bar disconnect has a dangerous defect, and thus poses a serious safety risk to drivers, occupants, and the general public (hereinafter, "the Sway Bar Defect").  Specifically, the electronic circuit board for the sway bar disconnect is in a housing with seals that are prone to failure and is located in an area that is likely to get wet or sprayed under ordinary or expected conditions, such as driving over puddles or in the rain. Failure of the circuit board occurs when liquid or contaminants breach a seal of the housing, resulting in a disconnected or malfunctioning sway bar.  In some instances, the electronic sway bar disconnect will fail and not reconnect, forcing the driver to drive on roads and highways without a sway-bar.  Driving on streets and highways with a disconnected or malfunctioning sway bar is dangerous.

5.      FCA has known about this problem for years but has taken no action to fix it.  Instead, FCA continues to sell the Class Vehicles as safe, reliable and fit for their ordinary purpose.  Even worse, FCA also denies warranty coverage for the Sway Bar Defect.  As a result, owners of the Class Vehicles have

2

suffered damages, including, *inter alia*: (1) out-of-pocket expenses to repair or replace defective electronic sway bar disconnects; (2) costs for future repairs or replacements; (3) sale of their vehicle at a loss; and/or (4) diminished value of their vehicles.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 Class members, members of the Classes (as defined below) are citizens of states different from FCA, and greater than two-thirds of the members of the Classes reside in states other than the states in which FCA is a citizen.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because FCA resides in and is headquartered in this district, regularly transacts substantial business in this district, is subject to personal jurisdiction in this district, and therefore is deemed to be a citizen of this district.  Additionally, FCA has advertised in this district and has received substantial revenue and profits from its sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

8.      This Court has personal jurisdiction over FCA because it is

headquartered and has otherwise conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within Michigan and throughout the United States.

## PARTIES

### A.    Plaintiffs

9.      Plaintiff Joshua Flores is a citizen of California and resides in Roseville, California.  Mr. Flores owns a 2018 Ram Power Wagon, which he purchased for his personal or household use in April 2018 from an authorized Ram dealer, Hoblit Dodge, in Woodland, California.  Prior to his purchase, Mr. Flores reviewed and relied on the window sticker.  He also spoke with a sales representative about the Class Vehicle he purchased.  None of the sources of information Mr. Flores reviewed disclosed the Sway Bar Defect.  If there had been such a disclosure, Mr. Flores would not have bought his Class Vehicle, or would have paid less for it.

10.     After his purchase, Mr. Flores experienced the Sway Bar Defect where the sway bar would not engage and the electronic sensors stopped functioning.  Mr. Flores brought his car to the dealer for repair, but after the attempted repairs, Mr. Flores had to bring the car back several times because the Sway Bar Defect continued to manifest.

11.     Plaintiff Alexandr Klimushkin is a citizen of California and lives

4

near Sacramento, California.  Mr. Klimushkin owns a 2018 Jeep Wrangler Unlimited Rubicon, which he purchased new for his personal or household use in January 2019 from Chapman Chrysler Jeep in Henderson, Nevada.  Prior to his purchase, Mr. Klimushkin viewed and relied on the window sticker, which did not disclose the Sway Bar Defect.  If there had been such a disclosure, Mr. Klimushkin would not have bought his Class Vehicle, or would have paid less for it.  Mr. Klimushkin has experienced the Sway Bar Defect, where the sway bar would not connect or disconnect on demand as advertised.

12.     Plaintiff Jason Henderson is a citizen of Michigan and resides in Royal Oak, Michigan.  Mr. Henderson owns a 2013 Jeep Rubicon, which he purchased for his personal or household use in 2013 from an authorized Jeep dealer, Cross Jeep in Louisville, Kentucky.  Prior to his purchase, Mr. Henderson reviewed and relied on the window sticker.  He also reviewed information on Jeep.com and spoke with a sales representative about the Class Vehicle he purchased.  None of the sources of information Mr. Henderson reviewed disclosed the Sway Bar Defect.  If there had been such a disclosure, Mr. Henderson would not have bought his Class Vehicle, or would have paid less for it.

13.     After his purchase, Mr. Henderson experienced a problem where the sway bar would not disconnect.  Later, the Sway Bar Defect again manifested

while Mr. Henderson was driving in a remote area of the Upper Peninsula of Michigan, which required him to tow the vehicle to his authorized Jeep dealer. Jeep attempted to fix the problem, but the Sway Bar Defect manifested almost immediately after the attempted repair. Mr. Henderson brought the vehicle in a second time to Jeep, but rather than address the problem, Jeep only disabled the electronic sway bar disconnect as a band-aid measure, and told Mr. Henderson that he would be required to pay $1,500 to replace the system.

14.     Plaintiff Patrick Gravenese is a citizen of New Jersey and resides in Vineland, New Jersey. Mr. Gravenese owns a 2013 Ram Power Wagon, which he purchased for his personal or household use in 2015 from Wholesale Outlet Automotive Group. Mr. Gravenese has experienced the Sway Bar Defect numerous times. Mr. Gravenese complained about the problem to an authorized Jeep dealer in Millville, New Jersey, but the dealer would not fix the problem under warranty.

15.     Plaintiff Mark Krohn is a citizen of New York and resides in Buffalo, New York. Mr. Krohn owns a 2015 Wrangler Unlimited Rubicon, which he purchased for his personal or household use in June 2015 from Koons Dodge Jeep in Vienna, Virginia. Mr. Krohn had his vehicle custom built, and prior to his purchase, he reviewed a build sheet showing options being ordered. Prior to his purchase, Mr. Krohn also viewed and relied on window stickers on similar Jeeps.

Neither the build sheet or the window stickers on similar Jeeps disclosed the

Sway Bar Defect.  If there had been such a disclosure, Mr. Krohn would not have

bought his Class Vehicle, or would have paid less for it.  Mr. Krohn experienced

the Sway Bar Defect in 2019.

**B.     FCA**

16.     Defendant FCA US LLC ("FCA") is a limited liability company

organized and existing under the laws of the State of Delaware, and is wholly

owned by holding company Fiat Chrysler Automobiles N.V., a Dutch corporation

headquartered in London, United Kingdom.  FCA's principal place of business

and headquarters is in Auburn Hills, Michigan, in the Eastern District of

Michigan.

17.     FCA (sometimes referred to as Chrysler) is a motor vehicle

"Manufacturer" and a licensed "Distributor" of new, previously untitled Chrysler,

Dodge, Jeep, and Ram brand motor vehicles.  FCA's Chrysler brand is one of the

"Big Three" American automobile brands.  FCA engages in commerce by

distributing and selling new passenger cars and motor vehicles under its Chrysler,

Dodge, Jeep, and Ram brands.  Other major divisions of FCA include Mopar, its

automotive parts and accessories division, and SRT, its performance automobile

division.  As of 2015, FCA is the seventh largest automaker in the world by unit

production.

18.     FCA's business operations in the United States include the manufacture, distribution, and sale of motor vehicles and parts through its network of independent, franchised motor vehicle dealers. FCA is engaged in interstate commerce in that it sells vehicles through this network located in every state of the United States.

19.     FCA sells its trucks through FCA franchise dealerships. FCA distributes information, including window stickers, about the Class Vehicles to its dealers for the purpose of passing that information to consumers. FCA also understands that its dealers pass on information from FCA about the characteristics, benefits, and quality of the Class Vehicles to consumers. The dealers act as FCA's agents in selling the Class Vehicles and disseminating information about them to customers and potential customers.

## TOLLING OF STATUTES OF LIMITATIONS

20.     Any applicable statute(s) of limitations have been tolled by FCA's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and Class members could not have reasonably discovered the true nature of the defects at issue here, and FCA's role in causing the defects, until shortly before this class action litigation was commenced.

21.     FCA was and remains under a continuing duty to disclose to Plaintiffs and the members of the Class the true character, quality and nature of

the Class Vehicles, *i.e.* that the electronic sway bar disconnects are defective and will require costly repairs, pose safety concerns, and diminish the resale value of the Class Vehicles.  As a result of the active concealment by FCA, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

<u>**PRE-SUIT NOTICE**</u>

22.     On March 3, 2020, Plaintiffs Joshua Flores and Jason Henderson sent via certified mail a pre-suit notice letter to FCA, which FCA received on March 7, 2020.  Among other information, the letter described the Sway Bar Defect and provided notice that Plaintiffs intended to commence a lawsuit.  The letter further stated that it was "sent on behalf of all similarly situated U.S. owners of Jeep Rubicon or Ram Power Wagon vehicles equipped with an electronic sway bar disconnect, regardless of model year (the 'Class Vehicles')."  The letter further stated that it provided notice under California Civil Code § 1782, "any other state-law consumer protection statute requiring pre-suit notice," and to the extent applicable, notice of breach of warranty.

23.     On March 26, 2020, Plaintiffs Klimushkin, Krohn and Gravenese sent a pre-suit notice letter to FCA that was identical in all material respects to the aforementioned March 3, 2020 letter.

9

## FACTUAL ALLEGATIONS

**I.      The Sway Bar Defect**

22.      A sway bar (sometimes called an "anti-roll" or "stabilizer" bar) is part of a car's suspension and is designed to keep the car level and prevent body roll.  When a car is inclined to lean to one side—which typically happens when the car turns—the sway bar helps resist leaning by applying upward force on one side and downward force on the other.  This force tends to restore the wheels to the same height and keeps the vehicle level.  Without a sway bar, a driver could lose control and flip the car when driving at high speed, particularly on a curve.

23.      Although the sway bar is an important safety feature in ordinary day-to-day travel, it is not ideal for "off-roading" or driving in rough and uneven terrain.  Temporarily disconnecting the sway bar when off-roading allows greater suspension "articulation," meaning how far up and down the axle can move relative to the car chassis.  Increasing articulation allows the vehicle to keep all four tires in contact with the ground on rough terrain, which in turn provides better stability and traction.  For example, if one wheel is forced up by a large boulder, the opposite side is pushed down as the suspension conforms to the terrain.  Conversely, if one wheel drops down into a deep hole, articulation allows the opposite and higher wheel to maintain contact with the ground.  Articulation is one of the most important factors in determining if a car can get over an obstacle.

24.     Generally, a driver with the right tools and know-how can obtain greater articulation by manually disconnecting the front sway bar links.  The Class Vehicles, however, are sold with an electronic sway bar disconnect, which is marketed as a premium off-road feature that allows the driver to connect or disconnect the sway bar with the flip of a dash-mounted switch.  The electronic sway bar disconnect is a material feature to consumers and comes at a premium price.

25.     FCA promotes this feature on its Jeep-brand website, jeep.com, where it claims "the Electronic Sway Bar Disconnect system allows you to remotely disconnect your sway bar from the cabin, so front wheels can drop and compress for better suspension and articulation on tough terrain."  This statement is accompanied by a handful of photographs depicting a Jeep Rubicon driving over a boulder-filled landscape where disconnecting the sway bar would be necessary or advisable:

 

 

26.    FCA also promotes this feature on its Ram-brand website for the Power Wagon, ramtrucks.com and in its brochures, where it states that the "Electronically Disconnecting Front Sway Bar, [is] essentially a two piece bar that disconnects, allowing far more front suspension articulation" and that the "front stabilizer bar allows up to 26.3 inches of articulation…"  This statement is also accompanied by a handful of photographs depicting a Power Wagon driving over rough terrain with the tagline "THERE IS SIMPLY NO OTHER TRUCK YOU CAN BUY WITH THIS LEVEL OF FACTORY-WARRANTED CAPABILITY." In fact, one of the main pictures in the Ram Truck Brochure prominently displays the actuator (circled in red):



27.     The design of the electronic sway bar disconnect is stunningly bad.

For starters, the electronic actuator mechanism and circuit board are in a housing

with seals that are prone to failure.  In turn, that housing is located low enough in the engine compartment that gets wet when the car drives over puddles, streams, or wet roads.  Water and/or other contaminants tend to damage electronic components.  When the circuit board for the electronic sway bar disconnect gets wet or comes in contact with contaminants, the system is prone to malfunction and/or complete failure.  This failure may also be exacerbated by the limited electrical insulation of the circuit board in proximity to the metal housing the circuit board is placed in.  In any case, the Class Vehicles' circuit boards uniformly fail and/or malfunction because of unwanted (but foreseeable) exposure to water and other contaminants.

28.    Below is a photograph of a damaged circuit board inside the housing:



29.     Below is a photograph of a damaged circuit board removed from the housing:



30.     Below is a photograph showing an under-chassis view of a Jeep, with the electronic sway bar disconnect circled in red:



15

31.    Below is a photograph showing an under-chassis view of a Power

Wagon, with the electronic sway bar disconnect circled in red:



32.    This failure, due to water and/or contaminant intrusion, occurs

through exposure to rain, road spray, and puddles on the road in the normal course

of driving.  To make matters worse, FCA tells consumers that its Jeep and Ram

vehicles have a water fording depth of 30 inches.  This information can be found,

for example, on interior door stickers and in the user manuals:

16



33.    At that depth, the actuator for the electronic sway bar disconnect would be, at least partially if not fully, submerged for both a Jeep and Power Wagon:





34.     Thus, even though the vehicles are advertised to be able to drive through water that partially, if not fully, submerges the sway bar actuator housing, the housings still fail in conditions much less extreme, such as those found on normal wet roads.

35.     When the electronic sway bar disconnect malfunctions due to exposure, drivers can no longer use it to re-connect the sway bars, making the vehicle hazardous to drive under normal driving conditions.  Owners also have

18

reported that malfunctions can cause the dashboard sway bar indicator light and/or the sway bar fault warning light to flash on and off erratically, causing an unsafe distraction.  Either way, the Sway Bar Defect poses a safety hazard and reduced function.

36.     The electronic sway bar disconnect system is the same or substantially the same in all Class Vehicles.  Most importantly, in each instance, the actuator housing is not properly sealed and is located in an area likely to get wet or sprayed.  Furthermore, the actuator part number for all Jeep Class Vehicles is the same: 68044411AC.  There are three actuator part numbers for the Ram Class Vehicles depending on the model year,[1] but for all Class Vehicles—whether Jeep or Ram— the actuators look alike and are identical in all material respects:

*Jeep Actuator*                          *Ram Actuator*




---

[1] 68044415AA (2005 Power Wagon); 6804412AA (2006-2012 Power Wagon); 68217400AA (2013 and later Power Wagons).

## II.     FCA's Knowledge Of The Sway Bar Defect

37.     FCA has known about the Sway Bar Defect since 2005, and in no event later than the time Plaintiffs purchased their vehicles.

38.     The design of the electronic sway bar disconnect is so obviously ill-conceived that FCA must have anticipated the Sway Bar Defect from the moment it put the feature on the market.  FCA also would have known about the defect through sources not available to Plaintiffs and Class members, including, but not limited to:  pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to FCA's network of dealers and directly to FCA, aggregate warranty data compiled from FCA's network of dealers, testing conducted by FCA in response to consumer complaints, and repair order and parts data received by FCA from its network of dealers and suppliers.

39.     FCA also must know about the Sway Bar Defect because since 2011 at the latest, there has been a small cottage industry of companies providing aftermarket manual disconnect systems to replace the stock electronic systems provided by FCA.  These products can be purchased directly from the manufacturers or on Amazon.com.  For example, EVO Manufacturing sells the "No Limits Manual Rubicon Sway Bar Disconnect," stating: "The Factory Rubicon Swaybar Disconnect is a great feature but is prone to breaking, shorting

out and all around being annoying.  The EVO No Limits Manual Disconnect now allows you to defeat the overly troublesome computer system that operates this very cool feature that Rubicon Model JK's come with."[2]  Other manufacturers such as Currie Enterprises and JKS Manufacturing also offer manual alternatives to the stock electronic sway bar disconnect found in the Class Vehicles.  It defies credulity that FCA would not know that other companies openly advertise and provide alternative parts solely to avoid or remedy manifestation of the Sway Bar Defect.

40.     For many years, FCA also would have been aware of customer complaints about the Sway Bar Defect as a result of online reputation management (or "ORM") efforts.  ORM is now a standard business practice among most major companies and entails monitoring consumer forums, social media and other sources on the internet where consumers can review or comment on products. "Specifically, [online] reputation management involves the monitoring of the reputation of an individual or a brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before they damage the individual's or brand's reputation."[3]  The growth of the internet and social media, along with the advent of reputation management

---

[2] http://evomfg.com/EVO-MFG-Products/Jeep-Gladiator-JT?product_id=154
[3] https://en.wikipedia.org/wiki/Reputation_management#Online_reputation_management.

21

companies, has led to ORM becoming an integral part of many companies'
marketing efforts.

41.     For many years, owners have been complaining about the Sway Bar
Defect on Jeep and Ram enthusiast websites like wranglerforum.com or jk-
forum.com.  FCA would have learned about these complaints in connection with
its ORM efforts.  The unusually high number of consistent complaints spanning
many years would have put FCA on notice of the Sway Bar Defect.  Examples are
quoted below, but many more are available online:

- April 2011: "Sway bar light keeps blinking when driving and if I try to
  disconnect sway bar it does not disconnect.  Anybody else had this
  problem?"[4]

   o April 2011 Response to post above:  "this has been talked about a
     thousand … no a million times, just do a search…

- October 2012:  I'm sure most JK Rubi owners are aware of the problems
  with the electronic sway bar disconnect system so I thought I would share
  my solution. When mine failed the dealership wanted $2200 to replace the
  entire sway bar system as they do not sell just the motor. The luxury of
  hitting a button to disconnect was not worth that kind of money to me,
  especially since there have been no improvements made to the system. It's
  not a matter of IF they'll fail, but WHEN, so I might as well have lit a match
  to that $2200. I considered just using the same type of manual disconnects
  that most jeepers use, until I came across Offroad Evolution's manually
  operated solution for the troublesome electronic motor.[5]

---

[4] https://www.jk-forum.com/forums/stock-jk-tech-12/electronic-sway-bar-disconnect-175897/
[5] https://www.jk-forum.com/forums/jk-write-ups-39/jk-rubicon-e-swaybar-disconnect-mod-250055/

- <u>December 2014</u>: "Hi everyone, I am having a lot of problems with my electronic sway bar disconnect system—it is shorting out and making a bunch of lights come on."[6]

- <u>February 23, 2016</u>: "Ok i have read tons of forums and complaints on the E-disco. I have had problems the last year and so much so that I haven't even thought about touching that dreaded button in fear I wouldn't be able to get the sway bar to reconnect. Well I get into the jeep for my daily 30 mile commute and the damn sway bar light is flashing!!! Out of no where, I haven't even been in 4 wheel drive in two weeks. I researched and tore the thing open to get a ton of black water pouring out. I cleaned it all up regreased and disconnected the battery in hopes my sway bar would re connect. No luck!!! The drive is terrible it sways like an ocean liner. Any tips on how to get it to reconnect. In the past I would have to get under it while I had the Mrs push the button while I shook it aggressively and it would reconnect it isnt working anymore. I think its time for Chrysler to admit they have a major issue and recall these dreaded POS."[7]

- <u>February 25, 2016</u>: "The dealer replace mine 3 time and on the 4th time they would not. I have been using the EVO for a few years now and it works great. No more problems."[8]

- <u>July 2016</u>: "There's been some old older discussions about issues with the electronic sway bar disconnect, so I thought I'd add mine to the short pile.

  When I bought my '12 JKUR last December, something was wrong with the sway bar and they fixed it. Last weekend I went out on Switzerland Trail to test the skids I just put on...and guess what? Sway bar wouldn't disconnect. (Yup unfortunately this is the 1st time I've attempted it).

  Took it back to the dealership to moan and groan and wonder if they fixed the right thing. They pulled the records. At the time I was told the sway bar disconnected but wouldn't reconnect.

---

[6] https://www.jk-forum.com/forums/modified-jk-tech-2/disarm-electronic-sway-bar-disconnect-2012-jku-rubicon-314659/
[7] https://www.wranglerforum.com/f202/electronic-sway-bar-disconnect-problems-again-1621433.html
[8] *Id.*

23

In December they replaced a module. This past week I got to find out the actuator is bad, my extended warranty doesn't cover it, and the manuf 100k powertrain warranty doesn't cover it either."[9]

- <u>August 2018</u>: "I was considering adding the Mopar electronic sway bar disconnect that comes on the Rubicon to my Willys. But the more I read about it, the more I'm coming across LOTS of people that are having problems with it working reliably.

  The problem with it malfunctioning is apparently so prevalent that the aftermarket has stepped in with a lot of work around solutions to "fix" the Mopar disconnect, e.g. Manual release/engage cables, conversions to air actuation, video's that delete the circuit card entirely in the disconnect and actuate purely on 12vdc, etc..."[10]

42.     As a result of the combined factors described above, FCA knew about the defect at the time of sale, but Plaintiffs and Class members did not.  Given the nature of the Sway Bar Defect, it would have been difficult for Plaintiffs and Class members to discover the defect until after they purchased the Class Vehicles.

## III.   FCA Never Disclosed The Sway Bar Defect

43.     FCA had a duty to disclose the Sway Bar Defect to consumers. However, FCA has never disclosed the Sway Bar Defect in the owner's manuals, window stickers, or elsewhere.

44.     In the owner's manuals for Jeep and Ram vehicles, FCA made partial representations by describing in detail how to use the electronic sway bar

---

[9] https://www.jkowners.com/forum/stock-jk-tech-dept/329481-electronic-sway-bar-woes-options.html
[10] https://www.wranglerforum.com/f274/electronic-sway-bar-disconnect-alternatives-2325915.html

disconnect and the circumstances when using it is appropriate.  The owner's manuals did not disclose the Sway Bar Defect or otherwise disclose that the actuator mechanism and circuit board are in a housing with seals that are prone to failure.

45.    Jeep and Ram window stickers also highlighted the electronic front sway bar disconnect as a selling feature.  These partial representations also created a duty to disclose the Sway Bar Defect, but FCA never disclosed the Sway Bar Defect or otherwise disclosed that the actuator mechanism and circuit board are in a housing with seals that are prone to failure.

46.    For example, the Monroney Sticker for a 2019 Ram Power Wagon described a "Front Disconnecting Stabilizer Bar":

**STANDARD EQUIPMENT** (UNLESS REPLACED BY OPTIONAL EQUIPMENT)
FUNCTIONAL/SAFETY FEATURES
Advanced Multistage Front Airbags
Supplemental Side–Curtain Front and Rear Airbags
Supplemental Front Seat–Mounted Side Airbags
ParkView® Rear Back–Up Camera
ParkSense® Front / Rear Park–Assist System
4.10 Axle Ratio
Tru–Lok® Front and Rear Axles
Front Disconnecting Stabilizer Bar
WARN® 12,000–lb. Capacity Front Electric Winch
Ram Articulink® Suspension
Traction Control

47.    The Monroney Sticker for a 2016 Wrangler Unlimited Rubicon described a "Front Active w/ Driver Control Anti-Roll Bar":

48.     The Monroney Sticker for 2020 Wrangler Unlimited Rubicon

included identical descriptions of "Front Active w/ Driver Control Anti-Roll Bar":



49.     The Monroney Sticker for a 2011 Wrangler Rubicon described an

"Electronic front sway bar disconnect":

**MECHANICAL**

· 3.8L SMPI V6 engine
· 4.10 axle ratio
· Tru-Lok front & rear axles
· Hill start assist
· Next generation Dana 44 HD front axle
· Next generation Dana 44 HD rear axle
· 4:1 Rock-Trac HD part-time 4WD
system
· 600-CCA maintenance free battery
· 140-amp alternator
· (2) front/(1) rear tow hooks
· Rock rails
· Fuel tank skid plate
· Transfer case skid plate
· Performance suspension
· Rear stabilizer bar
· Electronic front sway bar disconnect
· Pwr steering
· 4-wheel disc brakes
· Hydraulic assist brake boost

50.    The above excerpts of Monroney stickers are representative examples.
The partial representations and omissions on the Monroney stickers for all other
Class Vehicles were the same or substantially similar, and in no case did FCA ever
disclose the Sway Bar Defect.

## IV.    FCA Breached Its Warranties

51.    The Class Vehicles were sold with a standard FCA "Basic Warranty,"
which was materially identical among all Class Vehicles.  The coverage period is
three years or 36,000 miles, whichever occurs first, and purports to cover the cost
of all parts and labor needed to repair any part in the vehicle that is defective in
material, workmanship or factory preparation, excluding tires.  Owners of Class
Vehicles are told to bring their cars to any authorized FCA Dealer for warranty

repairs.  The Basic Warranty begins "the date [the owner] take[s] delivery of the vehicle" or "when the vehicle was first put into service."

52.     Unbeknownst to Plaintiffs and members of the putative classes at the time of purchase the Class Vehicles were defective.  The location, housing and placement of the electronic sway bar disconnect cause or contribute to the Sway Bar Defect and constitute a defect in design, materials, workmanship and factory preparation.  FCA's failure to assemble and manufacture the electronic sway bar disconnect in such a way as to prevent manifestation of the Sway Bar Defect is a defect in materials, workmanship, factory preparation, as well as design.

53.     Replacing a damaged electronic sway bar disconnect typically costs approximately $1,500-$2,000 for the part alone, and not counting the additional costs of labor.  Hence, Plaintiffs and Class members suffer pecuniary harm when their warranty coverage is wrongfully denied, or any other circumstance requiring them to pay for repair or replacement of the electronic sway bar disconnect.

54.     FCA breached its express and implied warranties through which it promised to, *inter alia*, (1) provide Class Vehicles fit for the ordinary purpose for which they were sold; and (2) repair and correct manufacturing defects or defects in materials or workmanship of any parts they supplied, including the Sway Bar Defect.  Because the Sway Bar Defect was present at the time of sale or lease of

the Class Vehicles, FCA is required to repair or replace the electronic sway bar

disconnect under the terms of the warranties.

55.     Despite actual and constructive knowledge of Class Vehicle defects as

described in this complaint, FCA failed to cure Class Vehicle defects within the

express warranty period and thereby breached the terms of the express warranty.

56.     All Class Vehicles all contained the Sway Bar Defect, whether latent

or manifested, at the time of sale and within the warranty period.  However, despite

the existence of the express warranties, FCA fails to honor the terms of the

warranties by failing to adequately repair the defect free of charge.  Instead of

honoring the warranty, FCA either denies warranty repairs outright, or fails to

provide repairs that correct the Sway Bar Defect.

57.     FCA's written warranties also were unconscionable.  FCA knew about

the Sway Bar Defect at the time of sale or lease, but Plaintiffs and Class members

did not.  The Sway Bar Defect manifests during or after the warranty period, but

prior to the end of the Class Vehicles' useful lives.  Plaintiffs and Class members

had no meaningful choice in determining the temporal and/or mileage limits of the

warranties.  The warranties were drafted by FCA, without any input from

consumers, and there was a gross disparity in bargaining power in favor of FCA.

As a result, the terms of the warranties unreasonably favored FCA.

## <u>CLASS ACTION ALLEGATIONS</u>

58.     Plaintiffs bring this action pursuant to Federal Rules of Civil

Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Class

and Subclasses:

> All persons in the United States who purchased, leased, or own a Class Vehicle (the "Nationwide Class" or "Class");

> All persons in California who purchased, leased, or own a Class Vehicle (the "California Subclass");

> All persons in Michigan who purchased, leased, or own a Class Vehicle (the "Michigan Subclass");

> All persons in New York who purchased, leased, or own a Class Vehicle (the "New York Subclass"); and

> All persons in New Jersey who purchased, leased, or own a Class Vehicle (the "New Jersey Subclass").

59.     Subject to additional information obtained through further

investigation and discovery, the foregoing class definitions may be expanded or

narrowed by an amended complaint, or narrowed at class certification, including

through the use of multi-state subclasses.

60.     Specifically excluded from the Classes are FCA, FCA's officers,

directors, agents, trustees, parents, children, corporations, trusts, representatives,

employees, principals, servants, partners, joint ventures, or entities controlled by

FCA, and their heirs, successors, assigns, or other persons or entities related to or

affiliated with FCA and/or FCA's officers and/or directors, the judge assigned to

this action, and any member of the judge's immediate family.

61.    **Numerosity.**  The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiffs reasonably estimate that there are tens of thousands of individuals that are members of the proposed Classes.  Although the precise number of proposed members is unknown to Plaintiffs, the true number of Class members is known by FCA.  More specifically, FCA and its network of authorized dealers, maintains databases that contain the following information: (i) the name of each Class member that leased or purchased a vehicle; and (ii) the address of each Class member.  Thus, Class members may be identified and notified of the pendency of this action by first class mail, electronic mail, and/or published notice, as is customarily done in consumer class actions.

62.    **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a)    Whether the electronic sway bar disconnects installed in the Class Vehicles are prone to premature failure;

(b)    Whether the electronic sway bar disconnects installed in the Class

31

Vehicles contain a design defect and/or a defect in material, manufacturing and/or workmanship;

(c)     Whether the Sway Bar Defect in the Class Vehicles present a safety risk;

(d)     Whether FCA knew or should have known about the Sway Bar Defect when it sold the Class Vehicles;

(e)     Whether FCA had a duty to disclose that the electronic sway bar disconnects are defective and/or prone to premature failure and present a safety risk;

(f)     Whether FCA breached a duty to disclose the Sway Bar Defect;

(g)     Whether FCA intentionally and knowingly concealed, suppressed and/or omitted material facts about the existence of the Sway Bar Defect;

(h)     Whether Class members would pay less for a Class Vehicle if FCA, at the time of purchase or lease, disclosed the Sway Bar Defect;

(i)     Whether FCA is liable to Plaintiffs and Class members under the causes of action alleged in this complaint; and

(j)     Whether Plaintiffs and Class members are entitled to damages, restitution, equitable, injunctive, compulsory, and/or other relief

63.     **Typicality.**  Plaintiffs' claims are typical of the claims of the other

Class members in that Plaintiffs sustained damages arising out of the same illegal actions and conduct by FCA.

64.   **Adequacy of Representation.**  Plaintiffs will fairly and adequately protect the interests of Class members.  Plaintiffs have retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Classes.  Furthermore, Plaintiffs have no interests that are antagonistic to those of the Classes.

65.   **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by Class members is relatively small compared to the burden and expense of individual litigation of their claims against FCA.  It would, thus, be virtually impossible for Class members, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and

presents no unusual management difficulties under the circumstances.

66.    In the alternative, the Class and Subclasses may also be certified because:

(a)    the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for FCA;

(b)    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)    FCA acted or refused to act on grounds generally applicable to the Class and Subclasses whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Classes as a whole.

## CLAIMS FOR RELIEF

### COUNT I
**Breach of Express Warranty**

67.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

68.     Plaintiffs bring this claim on behalf of themselves and the Classes.

69.     FCA is and was at all relevant times merchants and sellers of motor vehicles as defined under the Uniform Commercial Code.

70.     With respect to leases, FCA is and was at all relevant times lessors of motor vehicles as defined under the Uniform Commercial Code.

71.     The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code.

72.     In connection with the purchase or lease of each of the Class Vehicles, FCA provided warranty coverage for the Class Vehicles, as alleged above.  Under the warranties provided to Plaintiffs and Class members, FCA promised to repair or replace covered defective components arising out of defects in materials, workmanship or factory preparation, excluding tires, at no cost to owners and lessors of the Class Vehicles.

73.     FCA's warranties, as well as advertisements, brochures, and other statements in the media regarding the Class Vehicles formed a basis of the bargain that was reached when Plaintiffs and Class members purchased or leased their Class Vehicles.

74.     Plaintiffs and Class members experienced the existence of the Sway Bar Defect within the warranty periods but had no knowledge of the existence of the defect, which was known and concealed by FCA.  Despite the existence of the

warranties, FCA failed to inform Plaintiffs and Class members that the Class

Vehicles contained the Sway Bar Defect.

75.     Because of the Sway Bar Defect, the Class Vehicles are not reliable

and owners of these vehicles have lost confidence in the ability of the Class

Vehicles to perform the function of safe and reliable transportation.

76.     Plaintiffs and Class members could not have reasonably discovered

the Sway Bar Defect prior to failure.

77.     FCA breached its express warranties by selling and leasing Class

Vehicles that were defective with respect to materials, workmanship or factory

preparation.

78.     Further, the limited warranty promising to repair and/or correct a

manufacturing defect fails in its essential purpose because the remedy is

insufficient to make Plaintiffs and Class members whole because, on information

and belief, FCA has failed and/or have refused to adequately provide the promised

remedies within a reasonable time.

79.     Because of FCA's breach of express warranty as set forth herein,

Plaintiffs and Class members assert, as additional and/or alternative remedies, the

revocation of acceptance of the goods and the return to Plaintiffs and Class

members of the purchase or lease price of all Class Vehicles currently owned or

leased, and for such other incidental and consequential damages as allowed.

80.     As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and Class members have been damaged in an amount to be determined at trial.

## COUNT II
**Breach of Implied Warranty**

81.     Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

82.     Plaintiffs bring this claim on behalf of themselves and the Classes.

83.     FCA marketed and placed the Class Vehicles into the stream of commerce with the intent they be purchased by Plaintiffs and Class members.

84.     FCA is a "merchant" for purposes of the Uniform Commercial Code because the company regularly sells consumer automobiles of this kind.

85.     As a result of the Sway Bar Defect, the Class Vehicles were defective and not of merchantable quality when they left FCA's control.  Plaintiffs and Class members used their Class Vehicles for the ordinary purpose that consumer automobiles are used—to reliably, comfortably, and safely transport passengers and belongings for personal, family, or household purposes.  Despite Plaintiffs' and Class members' ordinary and expected use of their vehicles, the Class Vehicles did not adhere to minimal consumer expectations, were not of fair and average quality, and would not pass without objection in the consumer automotive industry

at the time of sale.  The Class Vehicles also were not suitable for the specific

purpose of off-roading.

86.     FCA has been given a reasonable opportunity to cure its breach of the

implied warranty of merchantability and/or Plaintiffs and Class members were not

required to do so because such an opportunity would be futile.  FCA has known

about the Sway Bar Defect since and failed to repair or replace the Class Vehicles

to a minimum standard of quality.

87.     FCA's attempt to disclaim or limit the implied warranty of

merchantability vis-à-vis consumers is unconscionable and unenforceable here.

Specifically, FCA's warranty limitation is unenforceable because FCA knowingly

sold a defective product without informing consumers about the defect.  Further, a

disclaimer of implied warranties is effective only if it is conspicuous and made

available to the consumer prior to the sale of the product.  Any purported

disclaimer here was not conspicuous and not made available to consumers prior to

the sale of the product.

88.     As a direct and proximate result of FCA's breach of implied

warranty, Plaintiffs and Class members have been damaged in an amount to be

determined at trial.

## COUNT III
### Unjust Enrichment

89.     Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

90.     Plaintiffs bring this claim on behalf of themselves and the Classes.

91.     To the extent required by law, Plaintiffs bring this claim in the alternative to other legal claims alleged in the complaint, as permitted under Federal Rule of Civil Procedure 8.

91.     Plaintiffs and members of the Classes conferred a benefit on FCA by leasing or purchasing the Class Vehicles.  FCA was and should have been reasonably expected to provide Class Vehicles free from the Sway Bar Defect.

92.     FCA unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of its omissions and concealment of the Sway Bar Defect in the Class Vehicles.  FCA benefited, at Plaintiffs' expense, when it sold or leased Plaintiffs a vehicle that was inferior to the vehicle Plaintiffs thought they were purchasing, yet the price they paid was the price for a supposedly better functioning vehicle they thought they were purchasing.

93.     As a proximate result of FCA's omissions and concealment of the Sway Bar Defect in the Class Vehicles, and as a result of FCA's ill-gotten gains, benefits and profits, FCA has been unjustly enriched at the expense of Plaintiffs and Class members.  It would be inequitable for FCA to retain its ill-gotten profits

39

without paying the value thereof to Plaintiffs and Class members.

94.     There is a direct relationship between FCA on the one hand, and Plaintiffs and Class members on the other, sufficient to support a claim for unjust enrichment.  FCA failed to disclose the Sway Bar Defect to improve retail sales, which in turn improved wholesale sales.  Conversely, FCA knew that disclosure of the Sway Bar Defect would suppress retail and wholesale sales of the Class Vehicles, suppress leasing of the Class Vehicles, and would negatively impact the reputation of FCA's brand among Plaintiffs and Class members.  FCA also knew its concealment and suppression of the Sway Bar Defect would discourage Plaintiffs and Class members from seeking replacement or repair of the electronic sway bar disconnect, thereby increasing profits and/or avoiding the cost of such replacement or repairs.

95.     Plaintiffs and members of the Classes are entitled to restitution in the amount of FCA's ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct.

96.     Plaintiffs and members of the Classes seek an order requiring FCA to disgorge its gains and profits to Plaintiffs and members of the Classes, together with interest, in a manner to be determined by the Court.

## COUNT IV
### Violation Of California's Consumer Legal Remedies Act, California Civil Code § 1750 *et seq.* ("CLRA")

97.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

98.    Plaintiffs Flores and Klimushkin bring this claim on behalf of themselves and the other members of the California Class against FCA.

99.    FCA is a "person" as defined by California Civil Code § 1761(c).

100.    Plaintiffs and the other California Class members are "consumers" within the meaning of California Civil Code § 1761(d).

101.    By failing to disclose and concealing the Sway Bar Defect, FCA violated California Civil Code § 1770(a), as it represented that the Class Vehicles had characteristics and benefits that they do not have, represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another, and advertised the Class Vehicles with the intent not to sell them as advertised.  *See* Cal. Civ. Code §§ 1770(a)(5), (7) & (9).

102.    FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

103.    FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

104.    FCA was under a duty to Plaintiffs and the other members of the California Class to disclose the defective nature of the Class Vehicles' electronic sway bar disconnect systems and/or the associated repair costs because: a) FCA was in a superior position to know the true state of facts about Sway Bar Defect; b) Plaintiffs and the Class members could not reasonably have been expected to learn or discover that their Class Vehicles have a dangerous safety defect until after they purchased the Class Vehicles; and c) FCA knew that Plaintiffs and the other Class members could not reasonably have been expected to learn about or discover the Sway Bar Defect.

105.    By failing to disclose the Sway Bar Defect, FCA knowingly and intentionally concealed material facts and breached its duty not to do so.

106.    The facts concealed or not disclosed by FCA are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.  Had Plaintiffs and the other Class members known about the Sway Bar Defect at the time of purchase, they would not have purchased the Class Vehicles or would have paid less for them.

42

107.    As a result of FCA's misconduct, Plaintiffs and other Class members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

108.    As a direct and proximate result of FCA's unfair or deceptive acts or practices, Plaintiffs and the other Class members have suffered and will continue to suffer monetary losses.

109.    On or about March 7, 2020, prior to filing this action, a CLRA notice letter was served on FCA that complies in all respects with California Civil Code § 1782(a).

110.    In connection with their CLRA claim, the Plaintiffs Flores and Klimushkin and the California Class members seek damages, restitution, punitive damages, injunctive relief, and attorneys' fees and costs.

### COUNT V
### Violation of California's Unfair Competition Law ("UCL"),
### Bus. & Prof. Code § 17200 *et seq.*

111.    Plaintiffs hereby incorporate by reference and reallege the allegations contained in the preceding paragraphs of this Complaint.

112.    Plaintiffs Flores and Klimushkin bring this cause of action on behalf of themselves and the other members of the California Class against FCA.

113.    California Business & Professions Code Section 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

114.    FCA knew that the Class Vehicles suffered from a latent Sway Bar Defect, were defectively designed and/or manufactured, would fail prematurely, and were not suitable for their intended use.

115.    In failing to disclose the Sway Bar Defect, FCA knowingly and intentionally concealed material facts and breached its duty to disclose, thereby engaging in a fraudulent business act or practice within the meaning of the UCL.

116.    FCA was under a duty to Plaintiffs and the other members of the California Class to disclose the Sway Bar Defect because: a) FCA was in a superior position to know the true state of facts about the safety defect in the Class Vehicles; b) FCA made partial disclosures about the Class Vehicles without revealing the Sway Bar Defect; and c) FCA actively concealed the Sway Bar Defect from Plaintiffs and the other Class members at the time of sale and thereafter.

117.    The facts concealed or not disclosed by FCA are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease the Class Vehicles, or to pay less for them. Had Plaintiffs and the Class members known about the Sway Bar Defect at the

time of purchase, they would not have purchased or leased the Class Vehicles or would have paid less for them.

118.    FCA's omissions of material facts, as set forth herein, also constitute "unfair" business acts and practices within the meaning of the UCL, in that FCA's conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous.  Plaintiffs also assert a violation of public policy arising from FCA's withholding of material safety facts from consumers.  FCA's violation of consumer protection and unfair competition laws resulted in harm to consumers.

119.    FCA's omissions of material facts, as set forth herein, also constitute unlawful business acts or practices because they violate consumer protection laws, warranty laws and the common law as set forth herein.

120.    Thus, by its conduct, FCA has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

121.    FCA's unfair or deceptive acts or practices occurred repeatedly in FCA's trade or business, and were capable of deceiving a substantial portion of the purchasing public.

122.    As a direct and proximate result of FCA's unfair and deceptive practices, Plaintiffs and the other members of the California Class have suffered and will continue to suffer out-of-pocket losses.

123.   In connection with their UCL claim, the Plaintiffs Flores and Klimushkin and the California Class members seek restitution, disgorgement, injunctive relief, and any other relief available under the statute.

## COUNT VI
**Breach of Implied Warranty Under the Song-Beverly Act,
Cal. Civ. Code § 1790 *et seq.***

124.   Plaintiffs hereby incorporate by reference and reallege the allegations contained in the preceding paragraphs of this Complaint.

125.   Plaintiffs Flores and Klimushkin bring this cause of action on behalf of themselves and the other members of the California Class against FCA.

126.   Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, et seq., every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty that the goods are merchantable, as defined in that Act.

127.   The Class Vehicles at issue here are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

128.   Plaintiffs and the California Class members who purchased the Class Vehicles are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

129.   FCA is in the business of manufacturing, assembling, producing and/or selling the Class Vehicles to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

130.   FCA impliedly warranted to retail buyers that the Class Vehicles were merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used.  The Class Vehicles also were not suitable for the specific purpose of off-roading, due to the Sway Bar Defect.  FCA breached implied warranties because the Class Vehicles were unsafe and defective.  Therefore, the Class Vehicles would not pass without objection in the trade or industry, were not fit for the ordinary purpose for which they are used, and not fit for the specific purpose of off-roading.

131.   The Class Vehicles were defective at the time of sale when they left the exclusive control of FCA or FCA's agents.  The defect described in this complaint was latent in the product and not discoverable at the time of sale.

132.   FCA knew that the Class Vehicles would be purchased and used without additional testing by Plaintiffs and Class members.

133.   Even if FCA's express warranty purportedly included a disclaimer, the disclaimer was legally insufficient to bar this claim.  Under section 1792.3 of the Song-Beverly Act, implied warranties of merchantability and fitness may only be waived when the sale of consumer goods is made on an "as is" or "with all faults" basis.  The Class Vehicles were not sold on an "as is" or "with all faults" basis.

47

134.   As a direct and proximate cause of FCA's violation of the Song-Beverly Act, Plaintiffs and California Class members have been injured and harmed because they would not have purchased Class Vehicles if they knew about the Sway Bar Defect, or would not have purchased them on the same terms.

135.   Plaintiffs Flores and Klimushkin and the California Class members seek all relief available under the Song-Beverly Act.

## COUNT VII
**Violation of the New Jersey Consumer Fraud Act ("NJCFA")**

136.   Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

137.   Plaintiff Gravenese bring this cause of action on behalf of himself and the other members of the New Jersey Class against FCA.

138.   Plaintiff Gravenese and Class members have suffered an injury in fact and lost money or property as a result of FCA's violations of New Jersey's Consumer Fraud Act ("NJCFA").

139.   The NJCFA protects consumers from "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . . ."  N.J. Stat. Ann. § 56:8-2.

140.   Plaintiff Gravenese and Class members are consumers who purchased and/or leased Class Vehicles for personal, family or household use.

141.   FCA engaged in unlawful conduct by deliberately and knowingly failing to disclose the Sway Bar Defect to secure the sale and/or lease of the Class Vehicles at a premium price.  FCA also failed to disclose the Sway Bar Defect during the limited warranty period to avoid having to perform warranty repairs.

142.   FCA did not fully and truthfully disclose to its customers the true nature of the Sway Bar Defect in the Class Vehicles, nor was this defect readily discoverable at the time of purchase or lease.

143.   FCA intended that Plaintiffs and the Class members rely on FCA's omissions, so that consumers would purchase and/or lease the Class Vehicles.

144.   Accordingly, FCA has engaged in unfair and deceptive trade practices, including advertising Class Vehicles with the intent to not sell them as advertised (i.e., suitable for off-roading with a functioning electronic sway bar disconnect); and otherwise engaging in conduct likely to deceive.  Further, FCA's acts and practices described herein offend established public policy because the harm caused to consumers outweighs any benefit associated with such practices, and because FCA fraudulently concealed the defective nature of the Class Vehicles from consumers.

145.    FCA's actions as set forth above occurred in the conduct of trade or

commerce.

146.    By engaging in the above-described practice and the actions and

omissions herein alleged, Defendants have committed one or more unlawful acts in

violation of the NJCFA.

147.    Plaintiff Gravenese seeks, on behalf of himself and the New Jersey

subclass, all relief available under the NJCFA.

**COUNT VIII**
**Violation of the Virginia Consumer Protection Act**
**(VA. Code Ann. § 59.1-196 *et seq*.)**

148.    Plaintiffs hereby incorporate by reference and reallege the allegations

contained in the preceding paragraphs of this Complaint.

149.    Plaintiff Krohn bring this cause of action on behalf of himself and the

other members of the Virginia Class against FCA.

150.    FCA is a "person" as defined by Va. Code Ann. § 59.1-198. The

transactions between Plaintiff Krohn and the other Virginia Class members on the

one hand and FCA on the other, leading to the purchase or lease of the Class

Vehicles by Plaintiff Krohn and the other Virginia Class members, are "consumer

transactions" as defined by Va. Code Ann. § 59.1-198, because the Class Vehicles

were purchased or leased primarily for personal, family or household purposes.

151.    The Virginia Consumer Protection Act ("Virginia CPA") prohibits (8)

advertising goods or services with intent not to sell them as advertised; … [and]

50

(14) using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction[.]" Va. Code Ann. § 59.1-200(A).

152.   In the course of its business, FCA failed to disclose and actively concealed the Sway Bar Defect.  FCA therefore engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer.

153.   In purchasing or leasing the Class Vehicles, Plaintiff Krohn and other Virginia Class members were deceived by FCA's failure to disclose the Sway Bar Defect.

154.   If FCA had disclosed the Sway Bar Defect, Plaintiff Krohn and other Virginia Class members would not have bought or leased the Class Vehicles, or would have done so on different terms.

155.   FCA's actions as set forth in this complaint occurred in the conduct of trade or commerce.

156.   FCA's actions were likely to deceive reasonable consumers, and in fact did so.

157.   FCA intentionally and knowingly failed to disclose the Sway Bar Defect, with the intent to mislead consumers.

158.   FCA knew or should have known that its conduct violated the Virginia CPA.

159.   FCA owed consumers, including Plaintiff Krohn and the other Virginia Class members, a duty to disclose the Sway Bar Defect.

160.    FCA's conduct proximately caused injuries to Plaintiff Krohn and other Virginia Class members.

161.   FCA's violations present a continuing risk to the general public, and affect the public interest.

162.   Plaintiff Krohn seeks, on behalf of himself and the Virginia Class members, all relief available under the Virginia CPA.

**COUNT IX**
**Violation of the Nevada Deceptive Trade Practices Act**
**(Nev. Rev. Stat. §  598.0903 *et seq*.)**

163.   Plaintiffs hereby incorporate by reference and reallege the allegations contained in the preceding paragraphs of this Complaint.

164.   Plaintiff Klimushkin bring this cause of action on behalf of himself and the other members of the Nevada Class against FCA.

165.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903 *et seq.*, prohibits deceptive trade practices. Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "9. Advertises goods or services with

intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction."

166.   In the course of its business, FCA failed to disclose and actively concealed the Sway Bar Defect.  FCA therefore engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer.

167.   In purchasing or leasing the Class Vehicles, Plaintiffs Klimushkin and other Nevada Class members were deceived by FCA's failure to disclose the Sway Bar Defect.

168.   If FCA had disclosed the Sway Bar Defect, Plaintiffs Klimushkin and other Nevada Class members would not have bought or leased the Class Vehicles, or would have done so on different terms.

169.   FCA's actions as set forth in this complaint occurred in the conduct of trade or commerce.

170.   FCA's actions were likely to deceive reasonable consumers, and in fact did so.

171.   FCA intentionally and knowingly failed to disclose the Sway Bar Defect, with the intent to mislead consumers.

172.    FCA knew or should have known that its conduct violated the Nevada

DTPA.

173.    FCA owed consumers, including Plaintiff Klimushkin and the other

Nevada Class members, a duty to disclose the Sway Bar Defect.

174.    FCA's conduct proximately caused injuries to Plaintiff Klimushkin

and other Nevada Class members.

175.    FCA's violations present a continuing risk to the general public, and

affect the public interest.

176.    Plaintiff Klimushkin seeks, on behalf of himself and the Nevada

Class, all relief available under the Nevada DTPA.

## COUNT X
### Violation of the Kentucky Consumer Protection Act
### (Ky. Rev. Stat. §  367.110 *et seq*.)

177.    Plaintiffs hereby incorporate by reference and reallege the allegations

contained in the preceding paragraphs of this Complaint.

178.    Plaintiff Henderson brings this cause of action on behalf of himself

and the other members of the Kentucky Class against FCA.

179.    FCA, Plaintiff Henderson, and each member of the Kentucky

Subclass is a "person" within the meaning of the Ky. Rev. Stat. Ann. § 367.110(1).

180.    FCA engaged in "trade" or "commerce" within the meaning of Ky.

Rev. Stat. Ann. § 367.110(2).

181.   The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Ky. Rev. Stat. Ann. § 367.170(1). In the course of its business, FCA willfully failed to disclose and actively concealed the Sway Bar Defect.  Accordingly, FCA engaged in deceptive business practices prohibited by the Kentucky CPA.

182.   In purchasing or leasing the Class Vehicles, Plaintiff Henderson and other Kentucky Class members were deceived by FCA's failure to disclose the Sway Bar Defect.

183.   If FCA had disclosed the Sway Bar Defect, Plaintiff Henderson and other Kentucky Class members would not have bought or leased the Class Vehicles, or would have done so on different terms.

184.   FCA's actions as set forth in this complaint occurred in the conduct of trade or commerce.

185.   FCA's actions were likely to deceive reasonable consumers, and in fact did so.

186.   FCA intentionally and knowingly failed to disclose the Sway Bar Defect, with the intent to mislead consumers.

187.   FCA knew or should have known that its conduct violated the Kentucky CPA.

188.   FCA owed consumers, including Plaintiff Henderson and Kentucky Class members, a duty to disclose the Sway Bar Defect.

189.   FCA's conduct proximately caused injuries to Plaintiff Henderson and other Kentucky Class members.

190.   FCA's violations present a continuing risk to the general public, and affect the public interest.

191.   Plaintiff Henderson seeks, on behalf of himself and the Kentucky subclass, all relief available under the Kentucky CPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully asks this Court to enter judgment against FCA and in favor of Plaintiffs and the Classes, and award the following relief:

A.    An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs representatives of the Classes, and Plaintiffs' counsel as counsel for the Classes;

B.    An order awarding declaratory relief and enjoining FCA from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged herein;

56

C.     Injunctive and equitable relief in the form of a comprehensive program to repair the Sway Bar Defect, and/or buyback all Class Vehicles, and to fully reimburse and make whole all Class and Subclass members for all costs and economic losses;

D.     A declaration that FCA is financially responsible for all Class notice and the administration of Class relief;

E.     An order awarding to the extent available under governing law, restitution, disgorgement, punitive damages, treble damages, exemplary damages and statutory damages; and compensatory damages for economic loss and out-of-pocket costs in an amount to be determined at trial;

F.     A declaration that FCA is required to engage in corrective advertising;

G.     An order requiring FCA to pay both pre- and post- judgment interest on any amounts awarded;

H.     An award of costs, expenses, and attorneys' fees as permitted by law; and

I.     Such other or further relief as the Court may deem appropriate, just, and equitable.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial

by jury of any and all issues in this action so triable of right.

Dated:  April 20, 2020        Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:  */s/ Frederick J. Klorczyk III*

Frederick J. Klorczyk III
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email:  fklorczyk@bursor.com

**BARBAT, MANSOUR, SUCIU &
TOMINA PLLC**
Nick Suciu III
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Telephone: (313) 303-3472
E-Mail: nicksuciu@bmslawyer.com

*Counsel for Plaintiffs*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Frederick J. Klorczyk III, declare as follows:

1.      I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs, and provide this declaration pursuant to Cal. Civ. Code § 1780(d).  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The District in which this action has been commenced is the proper place for trial because the Complaint alleges that a substantial portion of the events occurred in this District, and Defendant's principal place of business is in this District, and Defendant is doing business in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California on April 20, 2020.

*/s/ Frederick J. Klorczyk III*
Frederick J. Klorczyk III